*In re* DETENTION OF TROY A. WALKER, Inmate No. B28416 (The People of the State of Illinois, Petitioner-Appellee, v. Troy A. Walker, Respondent-Appellant).

Fourth District   No. 4—99—0186

Argued March 22, 2000.—Opinion filed June 15, 2000.

Robert Alan Dunst (argued), of Law Offices of Bob Dunst, of Mattoon, for appellant.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and William L. Browers and Lisa A. Smith (argued), Assistant Attorneys General, of counsel), for the People.

JUSTICE GARMAN delivered the opinion of the court:

Following a November 1998 jury trial in the circuit court of Coles

County, respondent Troy A. Walker was found to be a sexually violent person, pursuant to the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 1998)). He was committed to the Department of Human Services (Department) at the Sheridan Correctional Center (Sheridan). He appeals the jury's finding and his commitment to Sheridan. We affirm.

## I. BACKGROUND

On April 9, 1998, the State filed a petition asking that respondent be declared a sexually violent person and committed to the Department. The petition alleged that on November 28, 1994, the trial court sentenced respondent to a term of four years' probation upon his conviction of aggravated criminal sexual abuse. 720 ILCS 5/12—16 (West 1992). On January 23, 1995, the State filed a petition to revoke respondent's probation based upon respondent's contact with a five-year-old female. On February 27, 1995, the trial court sentenced respondent to a five-year prison term. On January 3, 1997, respondent was released on mandatory supervised release. On July 31, 1997, a parole warrant was issued for his arrest because he had touched a woman between the legs while in Cunningham Park in Mattoon. Respondent was arrested and committed to the Illinois Department of Corrections (DOC). The petition further alleged that respondent was to be released from DOC on April 18, 1998, and that he had been diagnosed as having mental disorders, including pedophilia, alcohol abuse, and cannabis abuse. He also has borderline intellectual functioning and a seizure disorder. The petition also alleged that respondent was dangerous to others because his mental disorders create a substantial probability that he will engage in acts of sexual violence. Following a hearing on April 14, 1998, the trial court found probable cause to commit respondent to the Department. Dr. Ronald Matthew was appointed respondent's expert to conduct an examination of him.

A jury trial commenced on November 10, 1998. Carol Waters testified that she had previously dated respondent. She called police after respondent touched her vaginal area over her clothes. The only reason she did so was because her grandmother disliked respondent.

Officer John McCain of the Mattoon police department testified that the park where the incident took place is near an elementary school. The students use the park for recess. The park contains playground equipment and is frequented by children.

Sherry Kalicak, a psychologist for DOC, testified that she is the lead therapist for the sex-offender program at Graham Correctional Center (Graham), a voluntary residential treatment program. Respondent was in the treatment program from July 1996 to January 1997.

Respondent told her that his first victim was a six- or seven-year-old nephew, whom respondent penetrated anally while armed with a knife. Respondent was 13 years old at the time. He stated he had been similarly abused when he was about this child's age. A 14-year-old male relative penetrated respondent anally while armed with a knife. Respondent was placed in foster care after his abuse of the nephew was discovered. While in the foster home, respondent orally and anally penetrated a child who was several years younger than him. He used force in this assault. Respondent was placed at Adolph Meyer. While there, he molested two younger boys. He was then placed in Salem, where he used force to molest younger boys. Respondent was next placed in St. Mary's Home for Boys in Beaverton, Oregon.

Kalicak testified that when respondent was 18 years old, he got a 13-year-old girl intoxicated. When she passed out, he sexually assaulted her. He fondled the genitals of his nine-year-old grandniece, who was his next victim. Respondent told Kalicak that he had molested a total of 10 boys and 2 girls.

Kalicak testified that respondent reported having persistent sexual fantasies that would intrude upon his thoughts frequently. These fantasies involved not only having sex with virgins but raping young girls, tying them up, and killing them. During his six months of treatment at Graham, respondent developed a basic understanding of his offense cycle and what his high-risk factors were. Respondent was also able to have empathy for his victims. Kalicak had no information as to the physical characteristics of the 13-year-old girl that respondent sexually assaulted. Respondent is at high risk for reoffending.

Anthony Schaab, a licensed clinical psychologist, testified that he is chief of mental health services for DOC and acting clinical director of the sexually violent persons evaluation unit at Sheridan. The program for sexually violent persons under the Act has a staff of three clinical psychologists. They screen files of sex offenders who are within 90 to 120 days of release. This includes DOC's master files on each offender, which contain all historical data, psychological reports, criminal history, and information on the offender's behavior while incarcerated. The staff and Schaab meet on a monthly basis and go through every case they have screened. The number may range from 70 to 100 cases. They vote as a group on which cases they feel may most likely be candidates for commitment under the Act. Over the last year, they have recommended about 23% of the cases they screen to be further evaluated. The psychologist who screened a particular case then interviews the offender. Approximately 25% of cases that are marked for further evaluation are then referred to the Attorney General for commitment proceedings. This amounts to about 7.5% of all cases

initially screened. Of that 7.5%, approximately 5% actually result in court proceedings.

Schaab testified that on December 1, 1997, he conducted a comprehensive evaluation of respondent's mental condition to determine his eligibility for commitment under the Act. Schaab gave respondent a set of questions referred to as the Hare Psychopathy Checklist. This is a series of questions that cover the person's entire life history and experiences. The entire interview took approximately two hours. Schaab's diagnosis of respondent was based upon the Diagnostic and Statistical Manual of the American Psychiatric Association, currently the fourth edition (hereafter DSM-IV). DSM-IV is the standard for diagnoses in the United States for psychologists, psychiatrists, and social workers. Schaab diagnosed respondent with (1) pedophilia, sexually attracted to both male and female young children; (2) alcohol abuse; (3) marijuana abuse; and (4) borderline intellectual functioning.

Schaab testified that pedophilia means displaying, over at least a six-month period, a pattern of sexual arousal or sexual behavior toward prepubescent young children ages 13 and under. The perpetrator has to be at least 16 years old and 5 years older than the victim. Respondent was 18 years old when he sexually assaulted the 13-year-old girl and 22 years old when he fondled his 9-year-old grandniece. Thus, respondent has offended multiple times against male and female children. Many of those instances involved children who were at least five years younger than respondent.

Schaab testified that respondent admitted in his interview that he had used alcohol very heavily, starting when he was 18 years old. The diagnosis of borderline intellectual functioning is a factor in pedophilia because lower functioning makes it more difficult to learn what deviant sexual urges are and how to control them. Schaab expressed an opinion within a reasonable degree of psychological certainty that a substantial probability exists that respondent will engage in future acts of sexual violence. Based on respondent's history, his greatest probability to reoffend would involve young children. Schaab's opinion that respondent is substantially likely to engage in future acts of sexual violence is based on (1) consideration of factors shown by research to increase the probability that a sex offender will reoffend and (2) the fact that respondent possesses several of these factors.

Schaab relied on certain studies regarding sex offenders, such as the Hanson and Bussiere study conducted in 1996. That study did a "meta-analysis," which involved the combining of research findings from multiple psychological studies into, in effect, one study. The analysis provided a list of factors that are most frequently related to

increased danger of reoffending. Many of these factors apply to respondent. Respondent was unsuccessful in his parole because he violated its conditions and engaged in behavior he knew created a high risk of reoffending.

Schaab testified that he agrees that respondent has a basic understanding of (1) his offense cycle, (2) a substantial portion of his high-risk factors, (3) intervention, and (4) empathy for his victims. He also has developed some coping strategies for intervention to take place. The sexual assaults that respondent committed during his teen years would not alone justify a diagnosis of pedophilia as an adult. Whether a 13-year-old girl had reached puberty would need to be taken into consideration in deciding whether a sexual act against the girl was an act of pedophilia. Schaab did not ask respondent about the physical characteristics of the 13-year-old girl he assaulted. The documents in respondent's file did not reveal anything about the girl's level of physical maturity.

Schaab testified that respondent showed "very[,] very little emotion" when discussing the impact of his actions on his victims. He seems to have an intellectual understanding of the impact of his actions on his victims, but he could not identify emotionally with the victims. Lacking an emotional understanding of the impact on victims would reduce motivation to change the offender's behavior.

A stipulation was read to the jury concerning respondent's conviction for his acts against his grandniece. Pertinent terms of his probation included (1) successfully completing all requirements of the sex offender treatment program at Coles County Mental Health, (2) obtaining a drug and alcohol evaluation and completing any recommended treatment, (3) abstaining from alcohol and drugs, (4) abstaining from any contact with children under 17 years of age, and (5) spending 180 days in jail. Within two weeks of his release from the Coles County jail, the State filed a petition to revoke respondent's probation for having contact with a five-year-old girl.

Paul Heaton was the State's next witness. He testified that he is a licensed clinical psychologist working for Affiliated Psychologists in Chicago. His firm is under contract with the Department to provide evaluations of sexually violent persons. Those evaluations are done only after Schaab or another psychologist under Schaab's direction has evaluated the offender. Heaton has personally evaluated 12 or 13 inmates.

Heaton interviewed respondent on May 4, 1998, spending four or five hours with him. Heaton administered a basic screening test to determine respondent's cognitive ability and personality profile. Respondent admitted that he had consumed a couple of beers prior to fondling his grandniece. The police reports Heaton read indicated re-

spondent had also smoked marijuana prior to the offense. During the interview, respondent did not mention having sex with a 13-year-old girl. Respondent started receiving special education assistance in second grade. He had difficulty reading the test questions that Heaton administered to him. Respondent admitted to Heaton that he considered himself to be an alcoholic. He reported hearing voices, even at the time of the interview.

Heaton expressed the opinion that respondent suffers from (1) pedophilia, sexually attracted to both males and females; (2) alcohol abuse; and (3) a psychotic disorder, not otherwise specified. The diagnosis of a psychotic disorder is warranted by respondent's reported auditory hallucinations. Heaton evaluated respondent on the basis of known factors for reoffending. Those factors include (1) childhood behavioral problems, (2) presence of previous sexual offenses, (3) alcohol abuse, and (4) the age of offender. Each factor an offender has multiplies the risk of reoffending.

Other factors include (1) victimizing males, (2) anger control, (3) sexual preference for young children, and (4) a negative relationship with the offender's mother. Yet another risk factor is that respondent had a negative relationship with his mother. Respondent has shown a low motivation for treatment. There were times when he did not comply with treatment requirements and was "kicked out" of treatment.

Heaton also used the RRASOR test. This is a rapid risk assessment score that focuses on four factors. Under that test, the most likely factor that would lead a person to reoffend is age. If the person was 25 years old or younger, he would be more likely to reoffend. Respondent does not meet that criterion because he is now 26 years old. The second factor is victims within the offender's family, which applies to respondent. The third factor is victimizing males, which also applies to respondent. The fourth factor is prior sexual offenses and respondent meets that criterion. Heaton's opinion is that there is a substantial probability that respondent will commit another act of sexual violence unless he receives significant further treatment. Respondent has "very great difficulty" controlling his impulses and this difficulty is aggravated by his use of alcohol and drugs.

Heaton testified that the RRASOR indicates that based on a score of three out of the four factors, the percentage of reoffending would be 25% over 5 years, and 37% over 10 years. That does not count the additional factor that respondent did not successfully complete outpatient drug and alcohol treatment. Under the RRASOR, it is important that the sexual offenses were detected and sanctioned in some way. Prior sexual offenses are considered only if they resulted in arrests and

convictions. Respondent has the 1994 criminal sexual abuse conviction. Heaton is not aware of whether respondent was adjudicated by the juvenile justice system for the offense against his nephew and his sexual offense against the boy in the foster home where he used force. Heaton was concerned with respondent's denial of the incident with Waters in the park. The acts that respondent engaged in as a juvenile do not count as part of the diagnosis of pedophilia. The two incidents that do count are the incident with the 13-year-old girl and the incident with respondent's grandniece. Heaton has no difficulty with the offense against the 13-year-old girl because the definition of pedophilia includes children ages 13 and under. The DSM-IV says that no precise age difference is specified and that clinical judgment must be used. Both sexual maturity of the child and the age difference must be taken into account. Heaton stated that it was not necessary to examine the 13-year-old girl because that age would generally be considered preadolescent. Heaton used the DSM-IV assumption concerning age and prepubescence.

Heaton testified that the diagnostic criteria in the DSM-IV are to be used as guidelines and not in a "cookbook" fashion. Giving a certain diagnosis to a person, even though the clinical presentation falls just short of meeting the full criteria for the diagnosis, is proper as long as the symptoms that are present are persistent and severe.

Ronald Matthew, a clinical psychologist and executive director of the Moultrie County Counseling Center in Sullivan, testified that he interviewed respondent for seven or eight hours in late May or early June 1998. The last two IQ tests given to respondent had scores of 88 and 85 and those are in the low-normal range, not borderline. Matthew believes, within a reasonable degree of psychological certainty, that the diagnosis of pedophilia is inaccurate. Matthew expressed his dissatisfaction with the DSM-IV, noting that while a person must have committed "recurrent" acts of sexual conduct within the six-month period, the DSM-IV does not say how many acts are required. In addition, previous versions of the DSM-IV defined pedophilia differently than does the current version. It is difficult to get an "accurate fit" when one tries to fit information from a case into sometimes ambiguous categories in the DSM-IV.

Matthew testified that he has diagnosed respondent with compulsive sexual disorder. A person with compulsive sexual disorder engages in sexual behavior as an anxiety- or stress-reduction activity. As with other compulsive disorders, people do it even though they know that they do not want to do it. There is no direct link between compulsive sexual disorder and dangerousness to others. This diagnosis does not, by itself, lead to a propensity to commit violent criminal offenses.

Based upon reports Matthew read, respondent's encounters with the boys in Salem Children's Home appeared to be consensual. Matthew testified that, from a psychological standpoint, acts of sexual conduct between consenting juveniles would not indicate a propensity to inflict harm on others. Matthew's opinion, within a reasonable degree of psychological certainty, is that there is no substantial probability that respondent will commit a sexually violent offense in the future. Matthew testified that the research is very clear in stating that the most accurate predictions of the risk of future offenses are those based upon actuarial assessments of probability. On a 10-year time frame, the probability estimate is 22%.

Matthew agreed that the primary consideration underlying the requirement that only arrests and convictions prior to the index offense are included under the category of prior sexual offenses is whether the offender has been detected or sanctioned for the offense and then continued to offend. Involvement by DCFS could be considered a sanction for the offense. Matthew stated that two separate acts within a six-month period could be considered recurrent.

Matthew stated his opinion that there is no direct correlation between a compulsive disorder and propensity to engage in violence. Matthew admitted that in his deposition given in June 1998, he gave an opinion that the combination of compulsive sexual disorder and alcohol abuse predisposes a person to engage in acts of sexual violence. However, he testified later in his deposition that there is no direct link between compulsive sexual disorder and likelihood of engaging in sexually violent activity in the future.

The RRASOR rules specifically require that prior sexual offenses must be based only on arrests and convictions. The rules get "real blurry" with sexual acts between older adolescents and children who are 12 to 14 years old. Studies have shown that approximately 98% of men will show sexual arousal toward 14- to 16-year-old girls who look like adult women. Accordingly, this issue is left to clinical judgment. However, the maturity level of the girl involved must be taken into consideration.

Following arguments of counsel and instructions to the jury, a verdict was returned finding respondent to be a sexually violent person. A dispositional hearing was held on February 3, 1999. The State rested on a predispositional investigation report prepared by Heaton. That report (1) summarized respondent's (a) background, (b) sexual offender history and treatment, (c) risk factors and potential problems, (d) current treatment, (e) options for available treatment, and (f) treatment needs; and (2) gave conclusions and recommendations.

In the risk factors and potential problems section, the report noted that respondent has difficulty controlling his anger. Research has shown that anger-control problems are a significant indicator of an increased risk of sexual recidivism. Respondent has a significant history of inappropriate sexual conduct in addition to his conviction. Respondent has a history of failure to complete sex-offender treatment programs. Failure to complete such treatment has been shown to be a risk factor for additional sexually violent behavior. Heaton testified that he spoke with respondent's primary therapists at Sheridan, where respondent was then being treated. They stated that respondent had been inconsistent in his motivation to be treated, at times wanting treatment and at other times avoiding treatment. He had failed to complete many assignments. Respondent's ability to reason is limited, and he becomes easily frustrated when treatment does not go as he had planned. This sometimes results in anger, expressed through passive-aggressive gestures, and occasionally through verbal threats. Although respondent has some knowledge of his risk factors, he has only limited skills to use this knowledge to direct his behavior. Respondent remains "highly volatile emotionally and has great difficulty managing his intense sexual urges." In December 1998, respondent was confined to his room for threatening harm to one of the staff. He reported having intense rape fantasies involving three female staff members, and he informed staff that he should not be allowed to be alone with these women.

As to treatment options open to respondent, the report stated that Coles County has limited support resources for sexual offenders being released from custody. The Coles County sexual offender treatment program has no inpatient secure housing available for offenders. Respondent's failure in his past treatment in the Coles County program was in large part responsible for his parole violation and return to prison. Sheridan has the only residential treatment facility in Illinois specifically designed to address the needs of sexually violent persons in a secure setting. Sheridan's core treatment areas include work on relapse prevention, cognitive restructuring, and journaling. Additional treatment areas available according to individual need include focused treatment for substance abuse, anger management, and victim empathy.

Heaton's report identified respondent's treatment needs as follows: (1) identify and address the factors that place respondent at substantial risk for sexual reoffending; (2) intensive treatment for alcohol-abuse and substance-abuse problems, which is critical due to the direct connection between respondent's alcohol abuse and his sexual offending; (3) anger management; (4) assist respondent to

confront and understand the impact of his own sexual abuse as a child and develop much greater empathetic skills than he currently possesses; (5) treatment that will help respondent to fully identify his pattern of deviant sexual arousal; (6) participation with a psychiatrist and compliance with any medication prescribed; (7) assist respondent to eventually be able to demonstrate an ability to sustain his participation in sex-offender treatment until completion of all treatment goals; and (8) establish a comprehensive and realistic relapse-prevention plan.

The report recommended that respondent be treated in a locked, inpatient residential treatment facility. His sexual attraction to children has not been significantly reduced by incarceration or previous outpatient treatment. Ten years of treatment have brought only modest progress in helping respondent understand his abuse cycle and risk factors.

Matthew testified on respondent's behalf that, according to the diagnosis in Heaton's report, respondent would be classified as a mentally ill substance abuser. He would need a treatment program that would address both his mental illness and his substance abuse. According to Matthew, such a treatment program could be provided in a community-based residential treatment center. He believes that would be the most appropriate setting for respondent. Matthew has investigated possible alternative sites where respondent could receive treatment. The most structured program that he found is the Gateway Program. The Chicago site is oriented to providing inpatient residential services on a long-term basis to mentally ill substance abusers. It has a high level of supervision, but is not a lockup facility. Gateway has no sex-offender treatment program. However, Gateway can refer sex offenders to an outpatient program specifically for sex offenders. He noted that respondent has no history of elopement. Matthew was unable to complete the referral package sent to him by Gateway, because he did not have access to information regarding respondent's recent physical and psychological information. Cooperation of the Department would be necessary.

Respondent testified that during the nearly one year he has resided at Sheridan he has received no substance-abuse treatment. He denied telling anyone at Sheridan that he wanted to rape someone. He wanted only consensual sex and was told that it would be considered rape if a staff member was involved. Respondent believes that he is not doing very well with his treatment at Sheridan. He believes he could cooperate with Gateway.

Respondent identified a letter that he wrote to his therapist at Sheridan in which he stated he was afraid to live in his room because

of his thinking about raping three female staff members. Respondent maintained that he used the term "rape" only because he had been told that sex with staff members would be considered rape.

Heaton testified in rebuttal that respondent has been referred for alcohol- and substance-abuse treatment, and this is part of his overall treatment plan.

Following final arguments, the trial court found that respondent is in need of institutional care in a secured facility. The court ordered respondent committed to the Department. On February 25, 1999, the trial court denied respondent's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. Respondent filed his notice of appeal.

## II. ANALYSIS

### A. Constitutionality of the Act

Respondent argues in his initial brief that the Act is unconstitutional. However, as respondent recognizes in his reply brief, this issue is now moot, as the Supreme Court of Illinois has upheld the constitutionality of the Act. *In re Detention of Samuelson*, 189 Ill. 2d 548, 727 N.E.2d 228 (2000).

### B. Finding That Respondent Is a Sexually Violent Person

■ Section 5(f) of the Act (725 ILCS 207/5(f) (West 1998)) defines "sexually violent person" as a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of a sexually violent offense by reason of insanity, and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence. The Act does not define the term "substantially probable." The State must prove the allegations of its petition beyond a reasonable doubt. 725 ILCS 207/35(d)(1) (West 1998). As the Act is relatively new, no case law interpreting the statute has been found.

■ Respondent argues that the finding of sexually violent person is against the manifest weight of the evidence. In doing so, he emphasizes the disagreement between the State's experts, Schaab and Heaton, and his own expert, Matthew. He also points out that the experts lacked knowledge regarding the physical maturity of the 13-year-old girl he sexually assaulted when he was 18 years of age. He argues that the girl's physical characteristics must be known to determine whether the diagnosis of pedophilia is proper.

None of the experts asked respondent about the girl's physical characteristics, and no evidence existed in respondent's record

concerning her maturity level. Schaab and Heaton testified that the level of maturity of a girl that age should be considered in deciding whether the assault against her could be used to justify a diagnosis of pedophilia. The DSM-IV contains a presumption that a 13-year-old girl is generally to be considered prepubescent. Schaab and Heaton adhered to this presumption in their diagnosis. Matthew, on the other hand, insisted that, despite the presumption, the girl's physical characteristics must be known to arrive at a diagnosis of pedophilia. Matthew also criticized the DSM-IV as being inconsistent from version to version and ambiguous regarding what factors must exist to make a diagnosis of pedophilia.

Despite the conflicting opinion of the experts on the issue of the physical characteristics of the 13-year-old girl, we conclude that the State proved beyond a reasonable doubt that respondent suffers from pedophilia. The reliance of Schaab and Heaton on the presumption of prepubescence of 13-year-old children was reasonable and permitted by the DSM-IV. We note that Matthew did not suggest any alternative to the DSM-IV in making a pedophilia diagnosis.

Respondent also argues that the State failed to prove beyond a reasonable doubt that a substantial probability exists that he will commit another sexually violent act in the future. He points out that while Heaton testified that respondent has a 37% chance of reoffending within 10 years, Matthew found that chance to be only 22%. Respondent notes that the Act provides no definition of "substantial probability."

We reject the notion that the question of substantial probability under the Act can be reduced to mere percentages. The opinions of Schaab and Heaton were based upon specific known risk factors that increase the probability of reoffending. Many of those risk factors apply to respondent, as the experts testified. The testimony showed that the more factors that apply to a person, the greater the likelihood of reoffending. Although respondent appears to understand the risk factors that he has on an intellectual level, he has thus far been unable to take the necessary steps to control his behavior. We conclude that the evidence established beyond a reasonable doubt that a substantial probability exists that respondent will commit another sexually violent offense.

## C. Commitment to the Department

■ Section 40(b)(2) of the Act (725 ILCS 207/40(b)(2) (West 1998)) directs the trial court to order that a person found to be a sexually violent person be committed to institutional care in a secure facility or conditionally released. In making this determination, the trial court

may consider (1) the nature and circumstances of the behavior that was the basis of the allegations in the State's petition; (2) the person's mental history and present mental condition; (3) where the person will live; (4) how the person will support himself; and (5) what arrangements are available to ensure that the person has access to and will participate in necessary treatment. The Department must arrange for control, care, and treatment of the person in the least restrictive manner consistent with the requirements of the person. 725 ILCS 207/40(b)(2) (West 1998).

■ Respondent believes the trial court should have committed him to Gateway or continued the matter and ordered the Department to cooperate with the application process for Gateway. In support of this contention, respondent cites section 40(b)(1) of the Act (725 ILCS 207/ 40(b)(1) (West 1998)), which provides that if the court lacks sufficient information to enter an order of commitment immediately after trial, it may adjourn the hearing and order the Department to conduct a predisposition investigation or a supplementary mental examination, or both, to assist the court in framing the commitment order.

Respondent asks this court to reverse the trial court's commitment order and enter an order of conditional release requiring participation at Gateway for both substance-abuse and sex-offender treatment. In the alternative, respondent argues that this court should remand the matter to the trial court for further proceedings after the Department is ordered to participate in the application process for Gateway.

Respondent has been treated for his inappropriate sexual behavior since the age of 13 years. Upon his conviction for molesting his grandniece, he received probation. One of the conditions of probation was that he complete recommended sexual-offender treatment. He was enrolled in the outpatient program at Coles County Mental Health but failed to complete treatment. While he was receiving sex-offender treatment, (1) he violated probation by having contact with the five-year-old girl and (2) the incident with Waters occurred. Regardless of whether the contact with Waters was consensual, respondent was in a public park frequented by children. He knew that he should avoid such places and that this was a high-risk behavior for him. In addition, respondent admitted drinking beer more than once and smoking marijuana one time during his probation. Those activities also violated the terms of respondent's probation. Respondent requires treatment in a locked, secure facility that only Sheridan can provide. Thus, we conclude that the trial court did not err in ordering respondent committed to the Department.

## D. Prosecutor's Opening Statement and Closing Argument

The material in this section is nonpublishable under Supreme Court Rule 23 (166 Ill. 2d R. 23).

## III. CONCLUSION

For the reasons stated, we affirm the judgment and commitment of respondent to the Department.

Affirmed.

MYERSCOUGH and KNECHT, JJ., concur.