653 N.W.2d 613 (2002)
In re the DETENTION OF Daniel HOLTZ.
STATE of Iowa, Petitioner-Appellee,
v.
Daniel HOLTZ, Respondent-Appellant.
No. 01-0243.
Court of Appeals of Iowa.
September 25, 2002.
*614 Robert L. Rausch of Rausch Law Firm, Waterloo, and James M. Metcalf, Waterloo, for appellant.
Thomas J. Miller, Attorney General, Scott D. Brown, Andrew B. Prosser, and Roxann M. Ryan, Assistant Attorneys General, for appellee.
Considered en banc.
MAHAN, J.
Daniel Holtz appeals from the judgment of commitment entered upon a jury's finding that he is a sexually violent predator under the Sexually Violent Predators Act, Iowa Code chapter 229A (1999). The unique issues raised by Holtz on this appeal concern the admissibility of actuarial risk assessment instruments in predicting a sex offender's risk of re-offense. Specifically, he argues the district court erred (1) by admitting the expert testimony relating to the actuarial risk assessment instruments and (2) by denying his motion for judgment notwithstanding the verdict given the unreliability of such expert testimony. We affirm.

Background Facts and Proceedings.
On December 30, 1998, the State filed a petition to commit Holtz as a sexually violent predator. At the time of the petition, Holtz was in the custody of the department of corrections, with a scheduled release date of January 23, 1999. The petition alleged that Holtz had prior convictions of qualifying sexually violent offenses as defined by Iowa Code section 229A.2(7)(a).[1] The petition also alleged Holtz suffered from mental abnormalities, which made him more likely to commit sexually violent offenses in the future. The district court held a probable cause hearing on January 26, 1999, and concluded there was probable cause to believe Holtz was likely to engage in sexually violent predatory criminal behavior upon his release. The district court ordered Holtz to be evaluated to determine whether he was a sexually violent predator.
Prior to trial, Holtz filed a motion in limine requesting the results from the actuarial risk assessment instruments, to be relied upon by the State's expert, be excluded given the instruments are unreliable, their predictive accuracy has not been tested, and they are untrustworthy. The district court denied the motion. At trial, the critical issue was whether Holtz was more likely than not to engage in acts of sexual violence in the future. On December 4, 2000, the jury returned a verdict finding Holtz a sexually violent predator as defined by section 229A.2(8). On the same day, the district court ordered Holtz to be committed to the custody of the department of human services "for control, care and treatment until such time as his mental abnormality has so changed that he is safe to be at large." On December 8, 2000, Holtz filed a motion for new trial, *615 motion for judgment notwithstanding the verdict, and application for alternative treatment. Following a hearing, the district court denied these motions. Holtz appeals.
Admissibility of Actuarial Risk Assessment Instruments.
Iowa Rule of Evidence 5.702[2] provides as follows:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
Iowa R. Evid. 5.702.
We review for abuse of discretion. State v. Rodriquez, 636 N.W.2d 234, 245 (Iowa 2001). The decision of a trial court concerning the admissibility of evidence will only be overturned upon a showing that discretion was exercised "on grounds or for reasons clearly untenable or to an extent clearly unreasonable." Id.
In addition, we ordinarily will not reverse a district court's decision concerning the admission of evidence absent an abuse of discretion to the prejudice of the complaining party. Leaf v. Goodyear Tire & Rubber Co., 590 N.W.2d 525, 531 (Iowa 1999). "Only in a clear case of abuse will the admission of such evidence be found to be prejudicial." State v. Atwood, 602 N.W.2d 775, 783 (Iowa 1999), cert. denied, 529 U.S. 1091, 120 S.Ct. 1729, 146 L.Ed.2d 649 (2000). Rule 5.702 and our case law make it clear that "we are committed to a liberal view on the admissibility of expert testimony, and we have been quite deferential to the district court in the exercise of its discretion in that area." Mensink v. Am. Grain, 564 N.W.2d 376, 380 (Iowa 1997).
Our supreme court has set forth several rules governing the admissibility of expert testimony. The court has stated:
We have laid down several principles governing the admissibility of expert testimony. First, the testimony must aid the jury in resolving a disputed issue. Second, the testimony must be reliable. This requirement necessarily follows from the first because unreliable testimony cannot assist a trier of fact. Third, the amount of foundation necessary to establish reliability depends on the complexity of the testimony and the likely impact of the testimony on the fact-finding process.... Last, there is no requirement that the expert be able to express an opinion with absolute certainty.
Johnson v. Knoxville Cmty. Sch. Dist., 570 N.W.2d 633, 637 (Iowa 1997) (citations omitted).
Thus, a threshold requirement for the admissibility of expert testimony is that the testimony must aid the trier of fact to resolve a disputed issue. Williams v. Hedican, 561 N.W.2d 817, 823 (Iowa 1997). If such testimony is to aid the trier of fact, it must be reliable. Id. The proponent of the expert testimony bears the burden of showing that it will aid the trier of fact. State v. Rains, 574 N.W.2d 904, 916 (Iowa 1998). In certain cases evidence might be so novel or complex that the court will require proof of acceptance of the theory or technique in the scientific community before the evidence is admissible. Mercer v. Pittway Corp., 616 N.W.2d 602, 628 (Iowa 2000).
The supreme court has further concluded that trial courts are not required to apply the analysis set forth in Daubert v. *616 Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), in considering the admission of expert testimony. Leaf, 590 N.W.2d at 533. However, the court stated "trial courts may find it helpful in complex cases to use one or more of the relevant Daubert `considerations' in assessing the reliability of expert testimony." Id. Therefore, trial courts may, in their discretion, consider the following factors if deemed helpful in a particular case:
(1) whether the theory or technique is scientific knowledge that can and has been tested, (2) whether the theory or technique has been subjected to peer review or publication, (3) the known or potential rate of error, or (4) whether it is generally accepted within the relevant scientific community.
Id. However, if "a trial court considers these factors, the court should focus solely on the principles and methodology, not on the conclusions that they generate." Id.
In making an admissibility analysis, the court has indicated that the determination should be on a case-by-case basis:
Determinations of admissibility of such evidence must necessarily be made on an ad hoc basis, ... and it would be impossible to establish rules binding in every case. Obviously the complexity of the subject matter will influence the foundational showing of reliability. For example, the foundation for neutron activation analysis ... or polygraph evidence... would require greater input from the scientific community than, for example, blow-ups of handwriting exemplars, ballistic comparisons, or tire tracks.
State v. Hall, 297 N.W.2d 80, 85 (Iowa 1980) (citations omitted). In addition:
In the present age of exploding technical and scientific developments and claims of "junk science," other "expertise" might be proffered that will, like polygraph evidence, have the potential to achieve an exaggerated impact on the fact-finding process.
Leaf, 590 N.W.2d at 534 (citations omitted).
The supreme court has stated the proper test for admission of expert testimony pursuant to Iowa Rule of Evidence 5.702 is as follows:
To be admissible in an Iowa court the evidence, of course, must be relevant. Second, it must be evidence in the form of "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." Third, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education." In addition, any potential for an exaggerated effect of the proffered evidence should be considered.
Id. at 533 (citations omitted). With these principles in mind, we turn to the contentions before us.
Appellate counsel agree that the critical issue before the jury was Holtz's likelihood to engage in future predatory acts constituting sexually violent offenses, if not confined in a secure facility. Iowa Code § 229A.2(8) (1999). The State's only witness on this issue was Dr. Caton Roberts, who utilized the following actuarial risk assessment instruments in evaluating Holtz:
(1) Rapid Risk Assessment for Sex Offender Recidivism (RRASOR),
(2) Static-99,
(3) Minnesota Sex Offender Screening Tools (MnSOST), and
(4) Minnesota Sex Offender Screening Tools  Revised (MnSOST-R).
Holtz objected to the admissibility of the results from these measurement instruments, *617 which the court overruled. Relying in part on these four measurement instruments, Dr. Roberts concluded, to a reasonable degree of medical certainty, that Holtz was more likely than not to engage in such acts if not confined in a secure facility.
During his testimony, Dr. Roberts acknowledged that these actuarial instruments have only been in existence for two to three years and that there are limitations to these instruments. However, it is clear Dr. Roberts's conclusion was also based on a full clinical evaluation and not just the result of the actuarial risk assessment testing. He testified his initial step in evaluating Holtz was a thorough review of a comprehensive file of materials and documents relating to his past criminal history. This review allowed him to reach a preliminary opinion on the relevant issues. However, this process was then followed by a clinical interview with Holtz. As a result of this interview and personality testing, he came to the conclusion, based upon a reasonable degree of medical certainty, that Holtz suffered from a mental abnormality.[3] Dr. Roberts then conducted the actuarial risk assessment tests and, based upon a complete clinical evaluation, concluded Holtz was more likely than not to engage in such acts if not confined in a secure facility. When specifically questioned concerning the reliability of the actuarial risk assessment instruments, he testified:
But I know that [Dr. Gratzer] was concerned about thethe juries and judges and courts being led to think that these things are the be-all and the end-all of prediction, quote/unquote, and thatand that the information about some of their limitations might not come out fully. He was arguing thatthat competent examiners ought to inform people that there are limitations to these instruments. I certainly feel that there are limitations to these instruments, and yet they are better than their alternative, which is nothing.
In response to Dr. Roberts's testimony, Holtz called two expert witnesses, Dr. Thomas G. Gratzer and Dr. Stephen D. Hart. On the issue of the actuarial risk assessment instruments utilized by Dr. Roberts, Dr. Gratzer testified to several limitations of these instruments. However, he did testify that he approved of the use of these instruments as long as they were not the sole basis for the expert assessment. In addition, Dr. Gratzer has himself relied upon the results of these tests and has concluded the tests could be used as part of an overall clinical evaluation. He did add a provision that one should be mindful that the tests have "not been scientifically established to be reliable."[4]
Dr. Hart also reviewed the actuarial risk assessment instruments used by Dr. Roberts and concluded the measurement instruments have many significant limitations. The following colloquy occurred during direct examination:
Q. Is it acceptable to perform the tests that he used?
A. Certainly. When we develop novel procedures, and this happens all the *618 time when we're engaging in professional practice, people develop new procedures, and then they want to see, how could I use this thing effectively? Well, you could certainly use an actuarial scale as a way of trying to determine the presence of various kinds of risk factors. Risk factors, just something that we think is a bad sign for the future. And so if you wanted to use an actuarial instrument to say, well, this fellow has several bad risk factors, then several bad signs, that's a legitimate use, and that would be supported in the scientific literature because we know that the content of most of these actuarial scales is very consistent with the general scientific literature on sex offenders going back a hundred years.
What's not accepted at this point in time is adding up those numbers to get some kind of aa score that you can then change into a prediction of the future. That's where the science doesn't support things. So having a list of bad signs, that's perfectly acceptable. Changing them into a number to predict the future, there's no basis for that. And if one wants to use the tests, one has to acknowledge that there is no foundation for that.
Q. If the tests are used to make predictions, is it acceptable to use them to look at them in combination with some other clinical observations?
A. Yes. This is, in fact, standard practice in various health care professions including psychology and general medicine. This is sometimes called structured professional judgment or guided or empirically based risk assessments where what we say is we have a list of factors that we always want to consider when we make a decision, so we always want to consider these factors. And then we want to consider any other relevant factor. Relevant, we mean specific to this case but not included in the general list.
Dr. Hart did, therefore, acknowledge it is acceptable to use the actuarial instruments as a way of trying to determine the presence of various kinds of risk factors.
In addition, in ruling upon respondent's renewed motion for directed verdict, the district court stated as follows:
We've made previous record on the admissibility of those tests, and I respond the way I've responded previously and emphasize again that it isit is clear that those measurement tools or tests are relatively new. However, it was clear to me, after hearing Dr. Roberts testify previously about them at probable cause hearings and other hearings that we've had in this case and other cases, that he does not represent them to be an end-all as to his conclusions and that he relies on them to corroborate as a check and balance, a starting point, all of those things apply. And, really, all of the expert witnesses in that field who testify, testify similarly. They all indicate that those tests can be used, that they are used and they all indicate that they'rethey're not the end-all to your evaluation.
I agree that it's very important that once those measuring tools are discussed and introduced into a case that full and complete cross-examination and disclosure about limitations of those tests be disclosed to the jury. That happened here. It was very clearly explained to the jury that the inquiry needs to go farther than simply a reliance on those measuring tools. Dr. Roberts acknowledged that. Dr. Gratzer talked about that, and Dr. Hart also talked about that. This jury, I'm very confident, is not going to be left with a mistaken assumption that that's what *619 they need to look at and that's all they need to look at. The tests do contain many factors that experts in that field rely on in order to make risk assessments as to recidivism. Respondent's experts testified about that as well as petitioner's expert, Dr. Roberts, testified about that.
I understand that there has been a dispute throughout regarding their admissibility. It's been my impression, knowing how they are used and knowing how the experts used them in the course of their evaluation in this type of case, that it went to the weight to be given to the measuring devices and not the admissibility of those. I was quite confident that the measuring tools would not be misrepresented to the jury because I was familiar with those and their treatment of those with the experts. And at the conclusion of the evidence I feel the same way. I know that they were not misrepresented. I know that this jury does not have some distorted view as to the accuracy and reliability of those. And perhaps largely as a result ofof very keen cross-examination and a thorough defense put forth by the respondent, it is clear that theythe jury knows the limitations of their use and reliance on those measuring devices. It goes to weight rather than admissibility. The instant case presents the first appellate challenge in Iowa to the admissibility of expert testimony regarding actuarial risk assessment instruments. There have been, however, judicial pronouncements on this issue in other jurisdictions. Our review of those decisions leads us to agree with the recent conclusion of the New Jersey Superior Court that "[o]ur research has revealed no state appellate court decision which has found actuarial instruments inadmissible at SVP proceedings."[5]In re Commitment of R.S., 339 N.J.Super. 507, 773 A.2d 72, 96 (App.Div.2001).
Following a careful review of the record, we conclude the district court ably summed up the issues and was correct in determining the evidence concerning actuarial risk assessment instruments went to the weight the evidence should receive as opposed to the issue of admissibility. The district court did not abuse its discretion in admitting this evidence. By this ruling, we are not concluding that actuarial risk assessment instruments are reliable per se or have our approval when used alone and not in conjunction with a full clinical evaluation. We note this was not the situation or issue presented in the instant case. The instruments were used in conjunction with a full clinical evaluation and their *620 limitations were clearly made known to the jury.

Judgment Notwithstanding the Verdict.
A district court's denial of a motion for judgment notwithstanding the verdict is reviewed for correction of errors at law. Iowa R.App. P. 6.4; Gibson v. ITT Hartford, 621 N.W.2d 388, 391 (Iowa 2001); Balmer v. Hawkeye Steel, 604 N.W.2d 639, 640 (Iowa 2000). The motion should be denied if the evidence is substantial. Revere Transducers, Inc. v. Deere & Co., 595 N.W.2d 751, 759 (Iowa 1999). "Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion." Johnson v. Dodgen, 451 N.W.2d 168, 171 (Iowa 1990). In addition, we view the evidence in the light most favorable to the party against whom the motion was directed. Faught v. Budlong, 540 N.W.2d 33, 35 (Iowa 1995).
We conclude that the district court acted properly in denying Holtz's motion for judgment notwithstanding the verdict.
AFFIRMED.
NOTES
[1] In 1995 Holtz was convicted of four counts of indecent exposure. Previously, Holtz was convicted of indecent exposure in 1976 and 1978 and third-degree sexual abuse in 1988.
[2] Formerly Iowa Rule of Evidence 702.
[3] Specifically, Dr. Roberts came to the conclusion that Holtz met the DSM-IV criteria for six diagnostic categories. There was little disagreement among the experts concerning this diagnosis.
[4] Gratner summed up his testimony as follows:

I believe that when you have tests that have not been scientifically established, you can look at them, you can consider them, but to blindly rely upon them wouldwould do an injustice.
[5] See, e.g., People v. Ward, 71 Cal.App.4th 368, 83 Cal.Rptr.2d 828, 832 (1999) ("In civil commitment cases where the trier of fact is required by statute to determine whether a person is dangerous or likely to be dangerous, expert prediction may be the only evidence available."); People v. Poe, 74 Cal.App.4th 826, 88 Cal.Rptr.2d 437, 440 (1999) (use of RRASOR upheld); Garcetti v. Superior Court, 102 Cal.Rptr.2d 214, 241 (2000) (use of PCL-R, RRASOR and Static 99 upheld); In re Detention of Walker, 314 Ill.App.3d 282, 247 Ill.Dec. 221, 731 N.E.2d 994, 998 (2000) (use of RRASOR upheld); In re Detention of Strauss, 106 Wash.App. 1, 20 P.3d 1022, 1024 (2001) (use of MnSOST, RRASOR and VRAG upheld); In re Detention of Campbell, 139 Wash.2d 341, 986 P.2d 771, 779 (1999) (reliance on actuarial and clinical assessment proper and weight to be given evidence is question for the jury). See also State, ex rel. Romley v. Fields, 201 Ariz. 321, 35 P.3d 82, 89 (2001) ("use of actuarial models by mental health experts to help predict person's likelihood of recidivism is not the kind of novel scientific evidence or process to which Frye applies"); Commonwealth v. Reese, 2001 WL 359954 at *9 (Mass.Super. April 5, 2001) ("statistics, in general, are better predictors of future sexual dangerousness than clinical judgments").