95 Cal.Rptr.2d 236 (2000)
80 Cal.App.4th 75
The PEOPLE, Plaintiff and Respondent,
v.
Jimmie Dale OTTO, Defendant and Appellant.
No. A086761.
Court of Appeal, First District, Division Five.
April 24, 2000.
Review Granted August 9, 2000.
*238 Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Senior Assistant Attorney General, Ronald S. Matthias, Supervising Deputy Attorney General, Linda M. Murphy, Deputy Attorney General, for plaintiff and respondent.
Ozro William Childs, Santa Rosa, under appointment by the Court of Appeal for defendant and appellant.
Certified for Partial Publication.[*]
*237 JONES, P.J.
This appeal arises from Jimmie Dale Otto's commitment under the Sexually Violent Predators Act (SVP Act or the Act). (Welf. & Inst.Code,[1] § 6600 et seq.) Otto raises numerous issues on appeal. In the published portion of this opinion, we address Otto's challenge to the trial court's admission of certain hearsay evidence under the authority of section 6600, subdivision (a). In the unpublished portion of this opinion, we address Otto's challenge to the sufficiency of the evidence and his other constitutional challenges. We affirm.

I. OVERVIEW OF THE SVP ACT
When the Legislature enacted the SVP Act in 1995, it explained the purpose of the Act as identification of incarcerated individuals who "are not safe to be at large and if released [would] represent a danger to the health and safety of others in that they are likely to engage in acts of sexual violence" and confinement and treatment of those individuals, if they are "found to be likely to commit acts of sexually violent criminal behavior beyond a reasonable doubt." (Stats.1995, ch. 763, § 1, No. 10 West's Cal. Legis. Service, p. 4611.) The process for determining whether a convicted sex offender meets the requirements for commitment under the SVP Act takes place "in several stages, both administrative and judicial." (Hubbart v. Superior Court (1999) 19 Cal.4th 1138, 1145, 81 Cal. Rptr.2d 492, 969 P.2d 584.) The judicial process under the SVP Act begins with the filing of a petition. (See Hubbart, supra, 19 Cal.4th at p. 1146, 81 Cal.Rptr.2d 492, 969 P.2d 584; see also § 6601, subd. (i).) After a petition is filed, the superior court "holds a hearing to determine whether there is `probable cause' to believe that the person named in the petition is likely to engage in sexually violent predatory criminal behavior upon release. [Citation.]" (Hubbart, supra, 19 Cal.4th at p. 1146, 81 Cal.Rptr.2d 492, 969 P.2d 584; see also § 6602.)
If the court finds the requisite probable cause, "the court orders a trial to determine whether the person is [a sexually violent predator (SVP)] under section 6600." (Hubbart, supra, 19 Cal.4th at p. 1146, 81 Cal.Rptr.2d 492, 969 P.2d 584; see also § 6604.) That section establishes two requirements for classification as a SVP. (Hubbart, supra, 19 Cal.4th at p. *239 1144, 81 Cal.Rptr.2d 492, 969 P.2d 584.) "First, ... an SVP must suffer from `a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior.' [Citation.]" (Id. at p. 1144, 81 Cal. Rptr.2d 492, 969 P.2d 584; see also § 6600, subd. (a).)
"Second, an SVP must have been `convicted of a sexually violent offense against two or more victims.' [Citation.]" (Hubbart, supra, 19 Cal.4th at p. 1145, 81 Cal. Rptr.2d 492, 969 P.2d 584, fn. omitted; see also § 6600, subd. (a).) Section 6600, subdivision (b) defines sexually violent offense as any one of a list of enumerated offenses "when committed by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, and that are committed on, before, or after the effective date of this article and result in a conviction or a finding of not guilty by reason of insanity, as provided in subdivision (a) ...." Section 6600.1 includes the following additional definition of sexually violent offense: "If the victim of an underlying offense that is specified in subdivision (b) of Section 6600 is a child under the age of 14 and the offending act or acts involved substantial sexual conduct, the offense shall constitute a `sexually violent offense' for purposes of Section 6600." (§ 6600.1, subd. (a).) "Substantial sexual conduct" is defined by section 6600.1 and "means penetration of the vagina or rectum of either the victim or the offender by the penis of the other or by any foreign object, oral copulation, or masturbation of either the victim or the offender." (§ 6600.1, subd. (b).)
At the trial, the trier of fact is charged with determining whether these requirements for classification as an SVP have been established "beyond a reasonable doubt." (§ 6604.) "[W]here the requisite SVP findings are made, `the person shall be committed for two years to the custody of the State Department of Mental Health for appropriate treatment and confinement in a secure facility designated by the Director of Mental Health....' [Citation.]" (Hubbart, supra, 19 Cal.4th at p. 1147, 81 Cal.Rptr.2d 492, 969 P.2d 584; see also § 6604.)

II. FACTUAL AND PROCEDURAL BACKGROUND
On October 9, 1991, Otto entered a plea of nolo contendere to four felony counts of lewd and lascivious touching of a child less than 14 years of age (Pen.Code, § 288, subd. (a)). The four counts involved four different victimsK.W., M.S., A.S., and D.S. On December 13, 1991, Otto was sentenced to 12 years in prison.
On February 27, 1999, the People filed a petition under section 6600 seeking Otto's commitment as an SVP. The trial court found probable cause to believe that Otto was an SVP under section 6600 and Otto waived his right to a jury trial on the SVP petition.[2]
A bench trial was held from March 3 through March 5, 1999. At the trial, three experts testified for the People and one expert testified for Otto. The first witness was Dr. Gary Zinik, a clinical forensic psychologist, who testified that he had reviewed numerous documents, including the presentence report, and had interviewed Otto for one and one-half hours. Dr. Zinik reported that Otto lived with the family of K.W. for a number of months and that Otto stated that he had not known the child well before he moved in with the family. Otto denied molesting K.W. and claimed that he merely tickled K.W. on her bare bottom as she ran down the hall. Relying on the presentence report, Dr. Zinik recounted K.W.'s allegation that Otto had molested her a number of times while he lived in her home. K.W. claimed that *240 Otto put her in his lap, fondled her vagina and buttocks under her clothes and threatened to ground her if she didn't comply with his demands. Dr. Zinik concluded that Otto's conviction for lewd and lascivious conduct with K.W. was a sexually violent predatory offense because Otto threatened to ground K.W., who was then only seven years old, if she did not comply with his demands, and because the frequency of the acts of molestation constituted substantial sexual conduct. Dr. Zinik also relied on statements made by K.W.'s mother that were included in the presentence report, indicating that since the molestations, K.W. is very nervous and has been seeing a counselor. Dr. Zinik concluded the crime met the predatory criteria because Otto began molesting K.W. shortly after he moved in with the family.
With respect to M.S., who was nine years old at the time of the molestations, Dr. Zinik reported that Otto denied ever touching this child. Dr. Zinik read Otto the portion of the presentence report where M.S. claimed that on one occasion Otto had penetrated her vagina with his fingers and on another occasion, he broke into her bedroom, penetrated her vagina with his fingers and raped her. Dr. Zinik concluded that this crime was also a violent predatory sex offense, finding the predatory component satisfied because Otto had lived with the S. family for six weeks when the acts of molestation occurred.
Otto also denied any sexual contact with A.S., M.S.'s younger sister. Dr. Zinik testified that A.S. reported that when she was seven years old, Otto penetrated her vagina with his fingers on a number of occasions and orally copulated her as well. Dr. Zinik concluded that this crime was predatory and offered the same reasons for his conclusion as he had given for Otto's crime with respect to M.S.
With respect to D.S., the younger brother of M.S. and A.S., Otto again denied any sexual contact. According to D.S., however, Otto touched D.S.'s genitals five times over his clothing.
Dr. Zinik also testified as to information that he gathered from Washington State court records. A.C., a daughter of Otto's second wife, reported that when she was seven years old, Otto sexually molested her on a number of occasions over a two-year period. These molestations included digital penetration, attempted intercourse and oral copulation. Otto also masturbated in A.C.'s presence. Otto was charged with two counts of first-degree statutory rape in the State of Washington. When Dr. Zinik inquired about these accusations, Otto denied molesting A.C. Dr. Zinik noted however that another psychologist, Dr. Charlene Steen, indicated that Otto had admitted to sexually molesting A.C.
Otto moved from Washington to Kansas where he met his third wife. Otto's third wife had two daughters, J.H. and R.H. Otto admitted molesting J.H., the older daughter, beginning when she was approximately 12 years old. At some point, the family moved to California and Otto began molesting, R.H., J.H.'s younger sister. R.H. was 11 years old at the time. Otto admitted these acts of molestation as well.
Dr. Zinik concluded that Otto suffered from the following diagnosable mental disorders: 1) pedophilia, sexually attracted to females, nonexclusive type; 2) polysubstance abuse; 3) alcohol abuse; 4) personality disorder not otherwise specified with antisocial traits. Dr. Zinik also concluded that Otto suffered from an impulse control disorder, which impaired his emotional and volitional control. Dr. Zinik explained that Otto's third wife, Janice, learned that Otto was molesting her children. Otto promised Janice that he would stop molesting children and even agreed to convert to the Mormon religion, yet he nevertheless resumed his sexual molestation of children. Dr. Zinik concluded that Otto was likely to engage in sexually violent criminal behavior in the future because Otto continued to molest children even after being discovered, *241 molested a boy in addition to girls and has a drug addiction.
Dr. Charles Jackson, a psychologist, was the second expert to testify. Dr. Jackson's opinions were based exclusively on review of documents because Otto would not consent to an interview. Dr. Jackson testified that he concluded Otto "had been convicted of a sexually violent crime against two or more victims that were predator[y] in nature." The first qualifying crime was the molestation of K.W. Dr. Jackson concluded that the molestation of K.W. was predatory because Otto had lived in the home of K.W.'s parents for only a brief period of time. Dr. Jackson concluded that the offense constituted "substantial sexual conduct" because Otto had touched K.W.'s vagina skin-to-skin on several different occasions, which Dr. Jackson concluded constituted masturbation.
Dr. Jackson found Otto's molestation of M.S. to be a second qualifying offense. His reasons for finding a predatory relationship were essentially the same as those that he had given for K.W. He concluded that the molestation of M.S. constituted substantial sexual conduct because Otto inserted his three fingers into M.S.'s vagina and had sexual intercourse with her. Dr. Jackson testified that Otto's molestation of A.S. constituted a third qualifying offense, again because of digital penetration and the brief, casual relationship between Otto and the victim.
Dr. Jackson concluded that Otto had a history of substance abuse, even while he was incarcerated, and diagnosed Otto as suffering from pedophilia, polysubstance abuse, personality disorder NOS (not otherwise specific) with antisocial and narcissistic features. Dr. Jackson explained that Otto scored a 3 on the RRASOR (Rapid Risk Assessment for Sexual Offense Recidivision) screening test for recidivism, a score that indicates a 24.8 percent recidivism rate at a 5-year level and a recidivism rate of 36.9 percent at the 10-year level. Dr. Jackson considered Otto's lack of responsibility, his dishonesty, and his lack of empathy, in addition to other factors, to conclude that Otto was more likely than not to reoffend.
Dr. Shoba Sreenivasan, a psychologist, was the People's final expert witness. Dr. Sreenivasan interviewed Otto and reviewed numerous documents, including the presentence report. Dr. Sreenivasan testified that she concluded that Otto had been convicted of sexually violent predatory offenses against two or more victims. The two qualifying offenses were the digital and penile penetration of M.S. and the digital penetration of A.S. Dr. Sreenivasan also reported that Otto admitted molesting three stepchildren.
Dr. Sreenivasan concluded that Otto suffered from pedophilia, same and opposite sex, nonexclusive type and stimulant dependency, cannabis abuse and personality disorder with narcissistic and antisocial features. It was Dr. Sreenivasan's opinion that as a result of Otto's mental disorder it was more likely than not that Otto would commit sexually violent criminal behavior.
Dr. Robert Leon Halon, also a licensed psychologist, testified on behalf of Otto. Dr. Halon interviewed Otto and reviewed numerous documents, including the presentence report. Otto admitted to Dr. Halon that he had molested A.C., J.H., and R.H. Dr. Halon concluded that Otto had a heavy substance abuse problem but found no indications of mental disorders or impairment concerning cognition affect or volition. Dr. Halon would not comment on whether Otto had committed two sexually violent predatory offenses and declined to opine whether Otto was more likely than not to commit additional sex offenses. Dr. Halon testified that he could find no evidence that Otto had impaired volition and hence could not find that Otto had a condition that predisposed him to commit sexually violent crimes. Based on a RRASOR score, Dr. Halon concluded that the probability of Otto reoffending in the future did not rise to the level of likely to reoffend. Dr. Halon concluded that Otto was "a prime candidate for outpatient treatment with close supervision, no confidentiality *242 and to be in substance abuse treatment and sex offender groups and individual treatment until hell freezes over." On examination by the trial court, Dr. Halon conceded that the RRASOR screening does not consider uncharged conduct. Thus, even if a person admitted 100 prior molestations, the RRASOR test would lead to the conclusion that the person has a very low likelihood of reoffense.
No other witnesses testified at the trial, but at the People's request, the trial court admitted the abstract of judgment and presentence report from Otto's felony convictions for molesting K.W., A.S., M.S. and D.S.; a 1991 evaluation by Dr. Steen that accompanied the presentence report; the written psychological evaluations of Drs. Zinik, Jackson and Sreenivasan; and the notification of evaluation. At Otto's request, the trial court admitted the written psychological evaluations of Drs. Halon and Owen. The report of Dr. Owen, who did not testify at the trial, concluded that while Otto had been convicted of sexually violent predatory offenses against two or more victims and while Otto had a diagnosable mental disorder, Otto was not a sexually violent predator because he was not likely to engage in sexually violent criminal behavior as a result of his diagnosed mental disorder. Dr. Owen reached the latter conclusion because in his opinion the findings of an actuarial analysis were equivocal, Otto had taken personal accountability for his crimes and Otto had not demonstrated a preoccupation with children.
On March 5, 1999, the trial court found beyond a reasonable doubt that Otto was an SVP within the meaning of section 6600. On March 11, 1999, the court granted the People's petition and ordered Otto committed to the state hospital for two years.

III. DISCUSSION

A. Admission of Hearsay Evidence
Otto raises a number of issues on appeal. He first contends that reversal is required because the trial court admitted a presentence report that contained hearsay and also admitted reports and testimony of experts that recounted the hearsay contents of the presentence report.[3] The parties agree that this issue turns on the meaning and scope of section 6600, subdivision (a), which provides in pertinent part as follows: "The existence of any prior convictions may be shown with documentary evidence. The details underlying the commission of an offense that led to a prior conviction, including a predatory relationship with the victim, may be shown by documentary evidence, including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of Mental Health."
Otto's argument on this issue is twofold. First, Otto contends that while section 6600 "clearly provides an exception to the general rule found in section 1200 of the Evidence Code," regarding hearsay, it does "not repeal section 1201 of the Evidence Code," regarding multiple levels of hearsay. Thus, according to Otto, the presentence report was admissible but the victim statements contained in the presentence report were not admissible unless they came within an exception to the hearsay rule.
In In re Malinda S., our Supreme Court addressed a similar contention raised with respect to the admissibility at a section 300 hearing of social studies that "contain hearsay and even multiple hearsay. [Citation.]" (In re Malinda S. (1990) 51 Cal.3d 368, 372-373, 375-379, 272 Cal.Rptr. 787, 795 P.2d 1244 (Malinda S.).) The provisions relevant to the court's analysis were section 281 and California Rules of Court, *243 rule 1450(c) (rule 1450(c)). (Malinda S., supra, 51 Cal.3d at pp. 376-379, 272 Cal. Rptr. 787, 795 P.2d 1244.) Section 281 provides that "[t]he probation officer shall upon order of any court in any matter involving the custody, status, or welfare of a minor or minors, make an investigation of appropriate facts and circumstances and prepare and file with the court written reports and written recommendations in reference to such matters. The court is authorized to receive and consider the reports and recommendations of the probation officer in determining any such matter." (Malinda S., supra, 51 Cal.3d at p. 376, 272 Cal.Rptr. 787, 795 P.2d 1244, quoting section 281.) At the time of the Malinda S. decision, former rule 1450(c) provided as follows: "A social worker's report that contains information relevant to the jurisdiction hearing shall be admissible if, on request of the parent or guardian, the probation officer or social worker is made available to be cross-examined regarding the contents of the report." (Malinda S., supra, 51 Cal.3d at p. 376, 272 Cal.Rptr. 787, 795 P.2d 1244, quoting California Rules of Court, rule 1450(c).)
The Supreme Court explained that "neither [section 281 nor rule 1450(c),] explicitly creates an exception to the hearsay rule." (Malinda S., supra, 51 Cal.3d at p. 376, 272 Cal.Rptr. 787, 795 P.2d 1244.) The court considered, however, whether these provisions "implicitly create hearsay exceptions for social studies" and concluded that they do. (Malinda S., supra, 51 Cal.3d at pp. 376-377, 382, 272 Cal.Rptr. 787, 795 P.2d 1244, citations omitted, italics added.)[4]
In reaching that conclusion, the court reviewed its earlier decision in Daniels v. Department of Motor Vehicles (1983) 33 Cal.3d 532, 189 Cal.Rptr. 512, 658 P.2d 1313 (Daniels), where it concluded that the Department of Motor Vehicles could not rely on hearsay in accident reports as the sole basis for a license suspension. (Malinda S., supra, 51 Cal.3d at p. 377, 272 Cal.Rptr. 787, 795 P.2d 1244.) The Malinda S. court distinguished Daniels, in part because "[u]nlike a report filed by one of the drivers involved in an accident, ... social studies ... are prepared by disinterested parties in the regular course of their professional duties. These elements of objectivity and expertise lend them a degree of reliability and trustworthiness not present in Daniels." (Id. at p. 377, 272 Cal. Rptr. 787, 795 P.2d 1244, fn. omitted.)
The court also concluded that the language of section 281 "provides greater indication of legislative intent both to admit the relevant report and to allow a court to rely on it in reaching a decision" than the Vehicle Code section at issue in Daniels which merely provided that the DMV "`shall consider its official records.'" (Malinda S., supra, 51 Cal.3d at p. 377, 272 Cal.Rptr. 787, 795 P.2d 1244.) Lastly, the court noted that "[a] further distinction between Daniels, supra, 33 Cal.3d 532, 189 Cal.Rptr. 512, 658 P.2d 1313, and the [Malinda S.] case is that the suspended driver in Daniels was not given an opportunity to cross-examine the preparer of the report," a right ensured to the parent or guardian by California Rules of Court, rule 1450(c). (Malinda S., supra, 51 Cal.3d at p. 378, 272 Cal.Rptr. 787, 795 P.2d 1244.)
The Malinda S. decision also looked to the consistent interpretation that the Courts of Appeal had given to Civil Code former section 233[5] as "further indicium of *244 legislative intent to create a hearsay exception for social studies ..." (Malinda S., supra, 51 Cal.3d at p. 379, 272 Cal.Rptr. 787, 795 P.2d 1244.) Civil Code former section 233, a statute that the court noted was similar to Welfare and Institutions Code section 281, "requires a specified county official to provide a report for use in proceedings to terminate parental custody rights. Subdivision (d) of that section further mandates that `The court shall receive the report in evidence and shall read and consider the contents thereof in rendering its judgment.'" (Malinda S., supra, 51 Cal.3d at p. 379, 272 Cal.Rptr. 787, 795 P.2d 1244.) The Supreme Court noted that "[b]ecause the reports [required by Civil Code former section 233] must include, inter alia, a statement of the minor's feelings and thoughts concerning the pending action (Civ.Code, § 233, subd. (b)), these reports necessarily contain hearsay and even multiple hearsay. Nevertheless, the Court of Appeal has consistently held that as long as a meaningful opportunity to cross-examine and controvert the contents of the report is afforded, such reports constitute competent evidence upon which a court may base its findings. [Citations.]" (Malinda S., supra, 51 Cal.3d at p. 379, 272 Cal.Rptr. 787, 795 P.2d 1244.)
Like the Malinda S. decision, we must consider whether a statute, in our case section 6600, subdivision (a), implicitly creates an exception to Evidence Code sections 1200 and 1201. Section 6600 expressly permits the People to show the "details underlying the commission of an offense" through "probation and sentencing reports." (§ 6600, subd. (a).) The details of the crime contained in a presentence report necessarily come from some source other than the author of the presentence report and hence must constitute second-level hearsay. Rule 411.5 of the California Rules of Court in fact contemplates that police reports will be used as the source of information for summarizing the crime in the presentence report. (See California Rules of Court, rule 411.5, subd. (a)(7)(i); cf. People v. Superior Court (Howard) (1999) 70 Cal.App.4th 136, p. 154, 82 Cal.Rptr.2d 481 ["Probation reports in felony cases necessarily include victim hearsay statements, pursuant to the requirements for probation reports set forth in California Rules of Court, rule 411.5(a)(5) ]".) By permitting the use of presentence reports at the SVP trial to show the details of the crime, the Legislature necessarily endorsed the use of multi-level hearsay.
Moreover, the presentence report and the police reports upon which the presentence report largely relies were "prepared by disinterested parties in the regular course of their professional duties," lending the documents elements of reliability and trustworthiness. (Cf. Malinda S., supra, 51 Cal.3d at p. 377, 272 Cal.Rptr. 787, 795 P.2d 1244.) The victim hearsay statements contained in a police report that are used at an SVP trial bear an additional indicia of reliability in that the defendant will have either pled guilty or nolo contendere or been convicted of a crime involving that victim. Otto argues that we should not treat his plea of nolo contendere in the same manner as a guilty plea or conviction. However, Penal Code section 1016 specifically provides that "[t]he legal effect of [a plea of nolo contendere] to a crime punishable as a felony, shall be the same as that of a plea of guilty for all purposes." (Pen. Code, § 1016, subd. 3, italics added.)
Malinda S. also found it important that the parent had the opportunity to cross-examine the preparer of the report. Otto contends that he had no such opportunity here. We presume that Otto means that he did not have the opportunity to examine *245 witnesses brought to the court by the People because he has not suggested that he did not have an opportunity to subpoena the testimony of the victims or the preparer of the presentence report. Malinda S. refers to an "opportunity" to cross-examine the witness but does not prescribe the particular form of that opportunity. Moreover, in Hubbart, supra, the Supreme Court concluded that "the Legislature could reasonably conclude that the evidentiary methods contemplated by the Act are sufficiently reliable and accurate to accomplish its narrow and important purpose confining and treating mentally disordered individuals who have demonstrated their inability to control specific sexually violent behavior through the commission of similar prior crimes." (Hubbart, supra, 19 Cal.4th at p. 1164, 81 Cal.Rptr.2d 492, 969 P.2d 584.)
We additionally note that the Act as originally enacted did not permit the use of documentary evidence. (See Stats.1995, ch. 763, § 3, No. 10 West's Cal. Legis. Service, p. 4611.) The Legislature modified the Act to permit such use after "[p]rosecutors" complained that "they [had to] bring victims back to court to re-litigate proof of prior convictions." (Sen. Com. on Crim. Proc., Civil Commitment: Sexually Violent Predators, Analysis of Assem. Bill No. 3130 (1995-1996 Reg. Sess.) as amended July 7, 1996, com. 4, p. 9; see White v. Ultramar, Inc. (1999) 21 Cal.4th 563, 572 fn. 3, 88 Cal.Rptr.2d 19, 981 P.2d 944 [taking judicial notice of committee report].) This complaint implies a desire to use documentary evidence in lieu of the victim's actual testimony. Section 6600 provides the People that opportunity and creates an implicit exception to Evidence Code sections 1200 and 1201, at least with respect to victim statements to police officers and "other disinterested parties in the regular course of their professional duties."
This case is decidedly different from Whitman v. Superior Court (1991) 54 Cal.3d 1063, 2 Cal.Rptr.2d 160, 820 P.2d 262. In Whitman, the Supreme Court concluded that Penal Code section 872, subdivision (b), does not permit one officer to serve as a reader of another officer's report. (Whitman, supra, 54 Cal.3d at p. 1073, 2 Cal.Rptr.2d 160, 820 P.2d 262.) However, the language of Penal Code section 872, subdivision (b) is unlike the language of section 6600, subdivision (a). Penal Code section 872, subdivision (b) permitted "`testimony of a law enforcement officer relating the statements of declarants made out of court....' (Italics added.)" (See Whitman, supra, 54 Cal.3d at p. 1073, 2 Cal.Rptr.2d 160, 820 P.2d 262.) In contrast, section 6600, subdivision (a), clearly authorizes the use of presentence reports for the hearsay statements they contain and hence constitutes an implicit waiver of Evidence Code sections 1200 and 1201.
As we stated at the outset, however, Otto's challenge is twofold. In addition to arguing that the statute does not constitute an exception to Evidence Code section 1201, Otto also argues that if the statute permits the use of multiple-level hearsay, it violates his constitutional right to confront and cross-examine witnesses as well as his right to due process.
To the extent Otto relies on the confrontation clause contained in the state and federal Constitutions, his challenge fails because an SVP commitment proceeding is a civil, not a criminal proceeding (In re Parker (1998) 60 Cal.App.4th 1453, 1461, 71 Cal.Rptr.2d 167), and "both the federal and state Constitutions confine the express right of confrontation to criminal defendants...." (Malinda S., supra, 51 Cal.3d at p. 383 fn. 16, 272 Cal.Rptr. 787, 795 P.2d 1244, italics added.) Cases, such as Whitman, that discuss a right to confrontation premised on the confrontation clause are therefore inapplicable. (See Whitman, supra, 54 Cal.3d at p. 1074, 2 Cal.Rptr.2d 160, 820 P.2d 262, citing Ohio v. Roberts (1980) 448 U.S. 56, 63-65, 100 S.Ct. 2531, 65 L.Ed.2d 597 [evaluating confrontation clause].)
*246 Nevertheless, a right to confront and cross-examine witnesses exists in civil proceedings, but the due process clause, not the confrontation clause, defines the scope and nature of that right. (See Malinda, supra, 51 Cal.3d at p. 383 fn. 16, 272 Cal.Rptr. 787, 795 P.2d 1244.) "`[D]ue process requires only that the procedure adopted comport with fundamental principles of fairness and decency. The due process clause of the Fourteenth Amendment does not guarantee to the citizen of a state any particular form or method of procedure.' [Citation.]" (In re Parker, supra, 60 Cal.App.4th at p. 1462, 71 Cal.Rptr.2d 167.) Under the Fourteenth Amendment of the federal Constitution, the Supreme Court tests the fundamental fairness of government decision-making against a balance of three distinct factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [Citation.]" [Citation.]' [Citation.] [¶] Our Supreme Court has determined that the California Constitution requires the consideration of these same three factors in addition to considering `the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible government official' before deciding what due process is due. [Citations.]" (60 Cal.App. 4th at pp. 1462-1463, 71 Cal.Rptr.2d 167.)
In People v. Superior Court (Howard), supra, 70 Cal.App.4th 136, 82 Cal.Rptr.2d 481, the Sixth District considered whether the admission into evidence at an SVP probable cause hearing of hearsay victim statements contained in probation reports violated the due process rights of the defendant. (Howard, supra, 70 Cal.App.4th at pp. 154-155, 82 Cal.Rptr.2d 481.) The Howard court addressed the first two due process factors as follows: "[W]hile the alleged sexually violent predator has a strong liberty interest, the government also has a strong interest in protecting the public from persons who are dangerous to others. [Citation.] If the defendant's sexually violent offenses can be established only by looking to the record of prior convictions, this additional procedural burden will severely limit the People's ability to protect the public by obtaining commitments under the SVP Act. [¶] ... If, as here, the defendant pled guilty before the preliminary hearing, or the victims' testimony was not sufficient to establish the details of the offense as required by the SVP Act, the state would never be able to meet its burden." (Howard, supra, 70 Cal.App.4th at p. 155, 82 Cal.Rptr.2d 481.)
The Howard decision also addressed the last two due process factors: "the proceedings mandated by the Act are adequate to enable a defendant to challenge the People's documentary evidence. By doing so, the defendant has the opportunity to thoroughly present his side of the story. Moreover, hearsay statements are obviously vulnerable to challenge by defendant as arguably unreliable summaries of victim and witness interviews, and the defendant may rebut the hearsay statements by providing his own version of the details underlying his offenses." (Howard, supra, 70 Cal.App.4th at pp. 154-155, 82 Cal. Rptr.2d 481.) We find the reasoning of Howard persuasive.
Otto urges us not to follow Howard because Howard concerned a probable cause hearing, not a trial, as is this case here. This distinction between Howard and the circumstances of this case affects the "private interest" component of the Howard court's analysis. At the SVP trial, the defendant faces a potential deprivation of liberty for two years, while at the probable cause hearing, a defendant's private interest is in his liberty during the *247 time between the probable cause hearing and the trial. Otto does not explain how this difference in private interests should require a different conclusion. Instead, Otto argues that Howard is distinguishable because the "right to confront and cross-examine is basically a trial right," but this argument again erroneously relies on the right to confrontation that applies exclusively to criminal proceedings.
Otto also contends that People v. Reed (1996) 13 Cal.4th 217, 52 Cal.Rptr.2d 106, 914 P.2d 184, not Howard, should guide our analysis. We agree with the Howard court's rejection of a similar argument made in that case. The Howard court reasoned as follows: "In Reed, the California Supreme Court held that excerpts from a probation officer's report were inadmissible hearsay which could not be used to prove that defendant's prior conviction was a serious felony involving use of a dangerous or deadly weapon. [Citation.] The court noted that it had previously ruled that the People may prove prior convictions only by evidence obtained from the record of the prior conviction, and may not utilize live witnesses or inadmissible evidence. [Citation.] This rule effectively `"bars the prosecution from relitigating the circumstances of a crime committed years ago and thereby threatening the defendant with harm akin to double jeopardy and denial of a speedy trial."' [Citation.]" (Howard supra, 70 Cal.App.4th at p. 153, 82 Cal.Rptr.2d 481.)
The Howard court distinguished the effect of section 6600: "the qualifying prior convictions are not `proved' in order to enhance the defendant's sentence; instead, the evidence of prior convictions is required as partial proof that the defendant has committed sexually violent offenses. [Citation.]" (Howard, supra, 70 Cal. App.4th at p. 154, 82 Cal.Rptr.2d 481.) The court further observed that section 6600 permits admission into evidence of probation and sentencing reportsreports that are required by rule 411.5 to include victim hearsay statements in felony cases, when available. (Howard, supra, 70 Cal. App.4th at p. 154, 82 Cal.Rptr.2d 481.)
In sum we conclude that section 6600, subdivision (a), creates an exception to Evidence Code sections 1200 and 1201 for witness statements communicated to police officers and "other disinterested parties in the regular course of their professional duties" and that this exception does not violate the defendant's due process rights. The presentence report in this case also explains that K.W.'s mother told an officer that she learned that K.W. had been molested after she asked her daughter if Otto had ever touched her in a way that made her feel uneasy. We need not decide whether the statute creates an exception to the hearsay rules for evidence communicated through individuals other than "disinterested parties in the regular course of their professional duties" or whether such an exception would comport with due process, because the inclusion of this evidence, even if in error, was harmless beyond a reasonable doubt.
B.-D.[**]
IV. DISPOSITION
We affirm the judgment.
HANING, J., and STEVENS, J., concur.
NOTES
[*] Pursuant to rule 976.1 of the California Rules of Court, this opinion is certified for publication with the exception of part III.B., C, and D.
[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.
[2] An express waiver of the right to a jury trial, although provided in this case, is not required. Pursuant to section 6603, subdivision (c), the absence of a demand for a jury trial will result in a court trial. (§ 6603, subd. (c).)
[3] "Although an expert may base an opinion on reliable hearsay, such evidence is not independently admissible. ([Evid.Code] §801;...)" (People v. McFarland (2000) 78 Cal. App.4th 489, 495, 92 Cal.Rptr.2d 884.)
[4] The Supreme Court has noted that the holding in Malinda S. has been partially codified and partially modified by 1996 amendments to section 355. (In re Cindy L. (1997) 17 Cal.4th 15, 22 fn. 3, 69 Cal.Rptr.2d 803, 947 P.2d 1340.) Despite the modification of section 355, Malinda S. remains authority for the type of analysis performed and the type of factors considered when inquiring whether a statute creates an implicit exception to the hearsay rule.
[5] In 1993, Civil Code former section 233 was repealed. (See Stats.1993, ch. 219, p. 1576.) We reiterate that we rely upon Malinda S. not for the particular statutes that it cites, but for the factors that it considers relevant. With respect to the discussion of Civil Code former section 233, we rely upon the Supreme Court's implicit endorsement of the reasoning of the Courts of Appeal, namely, that the fact that a report would necessarily include "multiple hearsay" counsels in favor of finding an implicit exception to the hearsay rules. (Malinda S., supra, 51 Cal.3d at p. 379, 272 Cal. Rptr. 787, 795 P.2d 1244; see also fn. 4, ante.)
[**] See footnote *, ante.